Sherie N. Buell
Lee F. Bantle
BANTLE & LEVY LLP
99 Park Avenue, Suite 1510
New York, New York 10016
(212) 228-9666
*Attorneys for Plaintiff*

Laura Sager
Washington Square Legal Services, Inc.
245 Sullivan Street, Fifth Floor
New York, New York 10012
(212) 998-6442
*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————
                                :

VICTORIA MONAHAN,              :     No. 22-cv-6016

                              :     ECF Case

              Plaintiff,      : 

                              :

          v.                :     **COMPLAINT**

                              :

NORTHWELL HEALTH, INC. and  : 

NORTH SHORE UNIVERSITY HOSPITAL,  :     **JURY TRIAL DEMANDED**

                              :

            Defendants.     : 

                              :

                              :

———————————————————————:

## PRELIMINARY STATEMENT

1. This is an action by the Plaintiff, Victoria Monahan ("Ms. Monahan"), under Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq.* (the "ADA"), and N.Y. Exec. § 296 *et seq.* (the "New York State Human Rights Law" or the "NYSHRL") against her former employer, the single integrated entity consisting of North Shore University Hospital ("NSUH") and Northwell Health, Inc. (collectively, "Northwell"), for hostile work environment

1

on the basis of disability, discrimination (constructive discharge) on the basis of disability, failure to provide a reasonable accommodation for disability, and retaliation due to disability.

2. Following Ms. Monahan's shoulder surgery in May of 2019, which severely limited her ability to lift and carry with her left arm, Defendants insisted that Ms. Monahan carry an iPad in her position as a dietetic technician. When she requested a reasonable accommodation, Defendants failed to engage in the interactive process as required by their own procedures and under the law. Instead, they required her to follow the specific procedure for employees returning from a medical leave which was limited to having her surgeon submit a particular form, did not allow for information to be submitted by her physical therapist, and did not give her the opportunity suggest ways in which her job could be modified to accommodate her physical limitation.

3. During the months of October through December 2019, the period in which Ms. Monahan was requesting reasonable accommodation, her supervisors repeatedly harassed Ms. Monahan, calling her insubordinate and threatening to fire her because she continued to request accommodation.  This conduct by her supervisors was so severe and pervasive as to materially alter her conditions of employment; caused Ms. Monahan to experience such acute anxiety and emotional distress that her working conditions were intolerable, amounting to constructive discharge, so that she felt compelled to resign her position; and constituted retaliation for her protected conduct of requesting accommodation.

## JURISDICTION, VENUE, AND PROCEDURAL REQUIREMENTS

4. This court has jurisdiction over Plaintiff's ADA claims under 42 U.S.C. § 12117(a) (citing 42 U.S.C. § 2000e-5) and 28 U.S.C. § 1331. Venue in this District is proper pursuant to 42 U.S.C. § 12117(a) (citing 42 U.S.C. § 2000e-5(f)(3)) in that the events in violation of the ADA took place in the State of New York.

5. This court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a), as all claims share a common nucleus of operative fact as to form part of the same case or controversy.

6. Plaintiff has exhausted all administrative remedies in a timely manner. On September 11, 2020, she dual filed a Verified Complaint against Defendant Northwell Health, Inc., with the New York State Division of Human Rights ("NYSDHR") and the Equal Employment Opportunity Commission ("EEOC") for unlawful discriminatory practice relating to employment.

7. On November 12, 2020, Defendant NSUH submitted a response, asserting that Ms. Monahan was an employee of NSUH, not Northwell Health, Inc., and therefore NSUH rather than Northwell Health, Inc., was the correct respondent.

8. On May 11, 2021, the NYSDHR issued a Determination After Investigation naming both Defendants, Northwell Health, Inc., and NSUH, as respondents, and found probable cause to support the allegations in Plaintiff's Verified Complaint. On June 7, 2021, Plaintiff requested a dismissal for administrative convenience from the NYSDHR under 9 N.Y.C.R.R. § 465 to pursue her claim with this Court. On February 3, 2022, the EEOC issued Plaintiff a Notice of Right to Sue (the "Notice"). On May 2, 2022, within 90 days of Ms. Monahan's receipt of the Notice, a Tolling Agreement (the "First Tolling Agreement") was entered into by Victoria Monahan, Northwell Health, Inc. and North Shore University Hospital, tolling the statute of limitations as of May 2, 2022 for a maximum of forty-five (45) days on all claims alleged in this Complaint under the ADA and NYSHRL.   On June 15, 2022, prior to the expiration of the First Tolling Agreement, a Second Tolling Agreement (the "Second Tolling Agreement") was entered into by Victoria Monahan, Northwell Health, Inc. and North Shore University Hospital, tolling

the statute of limitations as of June 15, 2022 for a maximum of thirty (30) days.  The Second Tolling Agreement terminates on July 15, 2022.

## PARTIES

9. Ms. Monahan resides in Long Beach, New York. From December 3, 2017, to January 6, 2020, she was employed in the position of dietetic technician at NSUH, a hospital wholly owned by Northwell Health, Inc.

10. While she was employed by Northwell, Ms. Monahan was unmarried, and her legal name was Victoria Mascari. In August 2021, after she no longer worked for Northwell, she married and in September 2021, she changed her legal name to Victoria Monahan, the name she now uses. Although her name at all times relevant to this action was Victoria Mascari, the complaint will refer to her by her current legal name, Victoria Monahan.

11. Defendant North Shore University Hospital is located at 300 Community Drive, Manhasset, NY 11030. It is a 766-bed teaching hospital that employs more than 6,000 physicians, nurses, and other trained medical staff. NSUH is one of the hospitals in the Northwell Health hospital system and is, upon information and belief, wholly owned by Northwell Health, Inc.

12. Defendant Northwell Health, Inc., is a not-for-profit corporation organized and existing under the laws of the State of New York with its principal place of business located at 2000 Marcus Avenue, New Hyde Park, NY 11042.  It is a nonprofit integrated healthcare network serving the New York metropolitan area. On information and belief, the Northwell Health System consists of twenty-three hospitals, including NSUH, the hospital where Ms. Monahan worked. Northwell Health issued the paychecks and W-2 forms that Ms. Mascari received and, on information and belief, provided various administrative and employee-relations services related to employees who worked at NSUH, including Ms. Monahan.

4

13. Defendants NSUH and Northwell Health, Inc., two nominally separated entities, are a single employer within the meaning of the ADA and the New York State Human Rights Law as they form two parts of a single integrated enterprise, and this single employer was the employer of Ms. Monahan.

## FACTS

A. Ms. Monahan's Hiring and Job Duties as a Dietetic Technician at NSUH

14. On December 5, 2017, Defendants hired Ms. Monahan in the position of dietetic technician in NSUH's Nutrition and Food Department.

15. Ms. Monahan's direct supervisor was the Office Manager, Aderonke Adegbenro ("Ms. Adegbenro"), who reported to the Assistant Director of Nutrition Services, Ambika Chawla ("Ms. Chawla"). Both supervisors reported to the Director of the Nutrition and Food Department, Michael Kiley ("Mr. Kiley"), who was thus Ms. Monahan's third line supervisor.

16. Dietetic technicians such as Ms. Monahan were responsible for providing meal services to hospital patients, which involved obtaining information about a patient's food preferences, allergies, and medical intolerances and assisting in modifying patients' daily menus to conform to the dietician's orders.

17. The job duties of dietetic technicians included verifying that patients' meal orders were input correctly into the system; standing at the end of the food tray lines in the kitchen to make sure that each food item matched the patient's meal ticket; and removing food trays from the line if the meal was not correct.

18. Most relevant for this lawsuit, dietetic technicians were responsible for collecting the meal orders from the patients, who were housed on nine floors of the hospital. The patients on eight of the nine floors either phoned in their meal orders to the dietetic technicians, who sat in

their office answering the phones, or filled out paper menus which the dietetic technicians collected from the nurses' station on their floor. Patients on only one of the nine floors (the seventh floor), gave their menu orders verbally to dietetic technicians who came to their rooms carrying an iPad on which they entered the order.

19. NSUH had fifteen different eight-hour shifts for dietetic technicians, with shift start times ranging from 5:00 am to 12:00 pm. Different shifts were responsible for collecting meal orders from different floors in the hospital and thus determined whether an iPad would be used.

20. During Ms. Monahan's employment, only one shift (either the 6:00 am or 6:30 am shift) required dietetic technicians to use an iPad to take patient food orders. Prior to Ms. Monahan's shoulder surgery (described in paragraph 25 below), she was consistently scheduled for and worked the 7:00 am shift, and thus did not use the iPad on a scheduled shift.

21. Prior to her shoulder surgery (described in paragraph 25 below), there were at most five occasions on which Ms. Monahan was asked to fill in for an employee assigned to work a shift that involved holding an iPad. On those rare occasions, Ms. Monahan had no trouble holding or using the iPad.

22. Based on how infrequently Ms. Monahan was asked to work a shift that involved carrying an iPad, that task was not an essential function of her job within the meaning of all applicable statutes.

B. Ms. Monahan's Medical Leave of Absence for Shoulder Surgery

23. In May of 2019, following an injury to her left shoulder, Ms. Monahan's orthopedic surgeon, Dr. Andrew Goodwillie, recommended shoulder surgery.

24. In or about mid-May 2019, Ms. Monahan notified her supervisor Ms. Aderonke that she needed to take a leave of absence for the surgery. Pursuant to Northwell's policies and

procedures, Ms. Monahan faxed her medical documentation to the third-party company that processed Northwell employees' requests for leave, AbsenceOne, and Northwell granted her request.

25. Ms. Monahan had the shoulder surgery on May 17, 2019. Thereafter, she had a few, intermittent follow-up visits with her orthopedic surgeon. At the direction of her surgeon, she began a program of twice-weekly physical therapy which continued to March 3, 2020, by which time she had lost insurance coverage.

26. In order for her to return to work after the surgery, Northwell required Ms. Monahan's surgeon to submit to Employee Health Services ("EHS") a Return to Work/Modified Duty Assessment Form ("Return to Work form"), on which he would indicate any limitations in her activity. Ms. Monahan met with her surgeon on June 19, 2019 and gave him a copy of the Return to Work form. She told him that the most physically demanding aspect of her job was occasionally lifting food trays that could weigh up to three pounds. She did not mention carrying an iPad because her use of the iPad had been so infrequent.

27. Later that day on June 19, 2019, Dr. Goodwillie submitted the Return to Work form to Northwell's EHS via their electronic system, as required. The system did not provide for Ms. Monahan to be given a copy, and Ms. Monahan did not learn until many months later what Dr. Goodwillie had written on the form.

28. On the Return to Work form, Dr. Goodwillie checked the box indicating that Ms. Monahan was restricted from lifting and carrying 0-15 lbs. He added a handwritten note stating that Ms. Monahan could lift no more than "3 lbs." and was unable to reach overhead. On information and belief, Dr. Goodwillie wrote the "3 lbs." limitation based on Ms. Monahan's telling him about the weight of the food trays she could be required to lift. He did not consider any

possible limitation related to lifting or carrying an iPad because Ms. Monahan had not mentioned the iPad to him.

29. On the form he submitted, Dr. Goodwillie cleared Ms. Monahan to return to work effective June 19, 2019. However, because of a delay in Human Resources ("HR") receiving the information from EHS, she did not return to work until one month later, July 15, 2019.

C. Ms. Monahan's Return to Work and Defendants' Requests that She Use the iPad

30. When she returned to work, the hospital still had only one shift that required carrying an iPad (either the 6:00 am or 6:30 am shift). This shift was now more onerous than before in that it now required a dietetic technician to carry an iPad for the full eight hours of the shift, rather than for only part of the shift as had previously been the case. The dietetic technician was not permitted to set the iPad down during a shift because of concern about possible contamination of the patient's room.

31. Upon her return from leave on July 15, 2019, Ms. Monahan continued to work the same shift that she had worked before her surgery, *i.e.*, the 7:00 am shift, which did not require her to use an iPad.

32. From July 15, 2019, until October 14, 2019, Ms. Monahan was neither scheduled for nor asked at any time to work an iPad shift.

33. On or around October 14, 2019, Ms. Monahan reported to work for her regularly scheduled 7:00 am shift, which did not require her to carry an iPad. Later that day, Ms. Adegbenro called Ms. Monahan into her office and asked her to cover the shift of another employee who had called out, which would require Ms. Monahan to carry an iPad.

34. Because of the continuing weakness and pain in her shoulder, Ms. Monahan believed that carrying the iPad would be harmful. Ms. Monahan consulted her physical therapist for

guidance, and her physical therapist recommended that she not carry the iPad.  In addition, although Ms. Monahan had not seen the Return to Work form her doctor had submitted, she believed that the restrictions in the form would have covered a restriction in carrying the iPad.

35. Ms. Monahan told Ms. Adegbenro that she could not carry the iPad because she was still suffering from pain and weakness from her recent shoulder surgery and was afraid of further injury. When Ms. Adegbenro pressed her to take the iPad, Ms. Monahan again refused, citing her inability to hold an iPad for up to eight hours as would have been required.

36. Ms. Adegbenro responded by saying that she "did not want to see [Ms. Monahan] fired for this." Ms. Monahan apologized, again stating that she could not perform the task due to her recovery from shoulder surgery. She then proceeded to work the remainder of her regularly scheduled shift.

37. Ms. Monahan left this meeting feeling stressed by Ms. Adegbenro's threat and worried about her job security. She felt that she had been a good employee and was upset that she was being treated with such disregard for her physical welfare.

38. Northwell's policies regarding reasonable accommodation state that if an employee makes a verbal request for accommodation to any person other than a Site HR representative, that person must direct the employee requesting the accommodation to Site HR. The Site HR then coordinates the collection of medical information documenting the employee's qualifying disability and the functional limitations that require a reasonable accommodation request and consults with EHS to examine the essential functions of the employee's position, as well as the nature, scope and duration of the employee's requested accommodation and/or applicable work restrictions.

39. On information and belief, (based on Mr. Kiley's testimony at Ms. Monahan's Unemployment Insurance Appeal Board hearing on August 24, 2020), EHS typically gives

employees only eight to twelve weeks of accommodation following a return from medical leave. After that, any continued request for accommodation must be processed according to Northwell's reasonable accommodation policy.

40. Ms. Monahan's statement to her supervisor that she could not carry the iPad because of her shoulder was, in effect, a request for reasonable accommodation. Under Northwell's policies, Ms. Adegbenro should have directed Ms. Monahan to Northwell HR so that Ms. Monahan could engage in an interactive process to evaluate her request and discuss possible accommodations. However, Ms. Adegbenro did not refer her to HR or, on information and belief, take any other steps in regard to Ms. Monahan's request.

41. In or around the end of October or early November 2019, Ms. Adegbenro again called Ms. Monahan into her office and asked Ms. Monahan to work an iPad shift. Ms. Monahan again stated that she was unable to work an iPad shift because of her continuing medical limitations from her shoulder surgery. Again, Ms. Adegbenro did not refer Ms. Monahan to Site HR as required by Northwell's policies. Instead, Ms. Adegbenro responded by threatening Ms. Monahan with discipline. She alluded to the possibility of reporting Ms. Monahan to Mr. Kiley and stated that she would not want to see Ms. Monahan fired. Ms. Monahan understood this conversation to mean that her employment would be terminated if she refused to carry the iPad. In the course of this conversation, Ms. Adegbenro accused Ms. Monahan of insubordination and of refusing to do her job.

42. After leaving this meeting, Ms. Monahan felt increasing distress and anxiety with respect to her job security and felt unfairly targeted and harassed because of her disability. These feelings spilled over from work to her personal life to the extent that she often became emotional whenever she began to speak or think about work.

43. On or about December 2, 2019, Ms. Adegbenro called Ms. Monahan into her office for the third time. Ms. Adegbenro again asked Ms. Monahan to carry an iPad to take patient orders although she was not scheduled that day for a shift that would require her to use an iPad. Ms. Monahan again responded that she could not carry an iPad because of her medical restrictions and because she feared further injury to her shoulder. Ms. Adegbenro told Ms. Monahan she was being insubordinate and dismissed Ms. Monahan from her office.

44. For the third time, Ms. Adegbenro failed to refer Ms. Monahan to Site HR to discuss her need for accommodation, violating Northwell's own reasonable accommodation policies.

45. On information and belief, Ms. Adegbenro reported this encounter to Mr. Kiley because later that day, Mr. Kiley called Ms. Monahan into his office. Mr. Kiley demanded to know from Ms. Monahan her reason for not working an iPad shift as requested by Ms. Adegbenro. Ms. Monahan responded by explaining that she was still recovering from shoulder surgery and was physically unable to carry an iPad for an entire eight-hour shift without risking injury.

46. Mr. Kiley then told Ms. Monahan that the Return to Work forms her doctor had submitted only limited her from carrying objects that weighed more than "3 lbs." He said that he had weighed the iPad and that it weighed approximately 2.5 to 2.75 lbs. This was the first time Ms. Monahan became aware that her Return to Work form listed 3 lbs. as her maximum weight limit. Ms. Monahan, who had an appointment scheduled with Dr. Goodwillie for December 12, 2019, told Mr. Kiley that she was going to see her doctor in the near future and would ask him to update her medical form.

47. Mr. Kiley told Ms. Monahan that she was being insubordinate and threatened her with termination if she refused to work an iPad shift.

48. Mr. Kiley's statements made Ms. Monahan fear for her job, increasing the levels of anxiety and stress she already felt as a result of Ms. Adegbenro's having harassed and threatened

11

her up to this point. She was so upset that she found it difficult to perform her job duties and to be present at her job at all.

49. Before their meeting ended, Mr. Kiley asked Ms. Monahan if she was willing that day to train a new dietetic technician in how to use the iPad. Understanding that the trainee would hold the iPad, she immediately agreed.

50. In this meeting, Mr. Kiley, once again, like Ms. Adegbenro, did not direct Ms. Monahan to Site HR as required by Northwell's policies. In addition, at no time did either Mr. Kiley or Ms. Adegbenro tell her that Site HR would engage in an interactive process in which she could provide whatever medical information she wished in support of her request – not limited to an updated Return to Work form from her surgeon – documenting her qualifying disability and the functional limitations that required a reasonable accommodation.

51. After December 2, 2019, although Ms. Monahan's supervisors did not instruct her to take on an iPad shift, Ms. Adegbenro repeatedly mentioned the issue of the iPad to Ms. Monahan, telling her that carrying the iPad was a requirement of her job.

D. Ms. Monahan's Interactions with HR

52. Although neither of her supervisors had told Ms. Monahan to go to HR, Ms. Monahan, on her own initiative did just that. Starting in October 2019, Ms. Monahan, on at least six (6) occasions, went to the HR office located in the hospital to seek assistance regarding the harassment and threats of termination she faced based on her medical limitations and her requests for accommodation. On each occasion, Ms. Monahan was only able to speak to the secretary, who told Ms. Monahan that the head of HR would email her to schedule a time to discuss her complaints. However, no one from HR ever directly contacted her.

53. On or about December 9, 2019, Ms. Adegbenro told Ms. Monahan that a representative from HR, Ms. Nasira Juman ("Ms. Juman"), wanted to speak with her. Ms. Monahan assumed this

meeting was in response to her repeated visits to HR over the past two months. However, Ms. Juman began the meeting by asking Ms. Monahan why she was refusing to do her job by declining to work an iPad shift. Ms. Monahan explained that she had medical limitations from her shoulder surgery and described the harassment she was experiencing from Ms. Adegbenro and Mr. Kiley, due to her requests for accommodation.

54. Ms. Juman responded by telling Ms. Monahan that her documented medical limitations did not match the accommodations she was requesting and instructed her to have her doctor submit an updated Return to Work form. Ms. Monahan told Ms. Juman that she was scheduled to see her orthopedic surgeon on December 12, 2019 and would do so. At no time in this conversation did Ms. Juman tell Ms. Monahan that she could submit alternate medical documentation instead of or in addition to the surgeon's Return to Work form, for example, documentation from the physical therapist who was continuing to treat her. Nor did Ms. Juman discuss whether there might be any modification of the way she used the iPad on the job, for example by allowing her to keep the iPad on a rolling cart.

55. On information and belief, (based on Mr. Kiley's testimony at Ms. Monahan's Unemployment Insurance Appeal Board hearing on August 24, 2020), after Ms. Juman met with Ms. Monahan on December 9, 2019, she sent an email to Mr. Kiley telling him that she had told Ms. Monahan to submit an updated Return to Work form and Ms. Monahan had agreed.

56. By telling Ms. Monahan only that she had to get an updated Return to Work form from her surgeon and failing to tell her that other methods of providing medical information were possible, the HR department failed to engage Ms. Monahan in Northwell's interactive process as described in ¶38 above.  In addition, the HR department's failure to investigate the essential functions of the employee's position, as well as the nature, scope and duration of the employee's

13

requested accommodation and/or applicable work restrictions, further constitutes a failure to engage in the interactive process.

57. On December 12, 2019, Ms. Monahan went to see her orthopedic surgeon, who noted that she was continuing to experience pain and weakness. She told him that her supervisors were asking her to hold an iPad for a full eight-hour shift and he agreed to submit a new Return to Work form which restricted her from lifting and carrying objects that weighed more than 1 pound.

58. Ms. Monahan expected that Dr. Goodwillie would submit the new form to EHS that same day, December 12th. However, she later learned that he did not send the form until December 19, 2019 and Defendants have claimed they did not receive it until December 20, 2019.

59. On December 16, 2019, Ms. Juman sent an email to Ms. Monahan informing her that Northwell HR had not yet received an updated Return to Work form from her doctor. The email stated that Ms. Monahan had until 5:00 p.m. the following day, December 17, 2019, to send an updated form or else Northwell would continue to ask that she work pursuant to the medical restrictions outlined in her previous forms. Since Dr. Goodwillie had told Ms. Monahan on December 12, 2019 that he would send in the form, Ms. Monahan despaired of resolving the situation.

E. Defendants' Final Threat to Terminate Ms. Monahan for her Refusal to Carry the iPad and her Subsequent Resignation

60. On or about December 19, 2019, Mr. Kiley called Ms. Monahan into his office for the second, and what would ultimately be the last, time. Mr. Kiley again asked Ms. Monahan for her specific medical reasons why she was still refusing to hold the iPad. Ms. Monahan said that she did not think she should be holding the iPad because she was still working on her shoulder recovery in physical therapy. She told Mr. Kiley that she saw her doctor on December 12 and that he told her he would send a note with a 1 lb. restriction on lifting.  Mr. Kiley expressed no interest in what

Ms. Monahan informed him. He told Ms. Monahan that her actions amounted to insubordination and threatened her with termination. Mr. Kiley ended the conversation by telling her to get out of his office.

61. Ms. Monahan left this meeting feeling targeted and harassed. Her doctor had told her on December 12, 2019 that he would send in a new Return to Work form, so she did not know what else she could do to remedy the situation. She was afraid that she would be fired by Northwell for what they were calling insubordination, which would make it difficult for her to find another job as a dietetic technician. She had devoted considerable time and effort to gain the training necessary to hold that specialized position and was terrified that she would never again be able to work as such. Under these circumstances she found her working conditions at Northwell intolerable.

62. Ms. Monahan was not scheduled to work on December 20 through December 22, 2019, so her next day at work was December 23, 2019. By this time, Northwell HR had received the updated Return to Work Form from Dr. Goodwillie, which set a weight limit of 1-lb, but Defendants did not inform Ms. Monahan of this development.

63. Back at work on December 23, 2019, Ms. Monahan believed that Defendants had refused to accommodate her disability and continued to harass her based on her medical condition and requests for accommodation. Due to her fear of continued harassment and a termination for insubordination and seeing no possibility of an appropriate accommodation being provided, Ms. Monahan concluded that she had no alternative but to resign. She wrote an email to her supervisors, Ms. Adegbenro and Mr. Kiley, giving them two-weeks' notice of her decision to resign, telling them that her last day of work would be January 6, 2021.

64. On information and belief, the supervisors forwarded Ms. Monahan's emailed notice of resignation to Ms. Juman in the HR department.

65. On information and belief (based on Mr. Kiley's testimony at Ms. Monahan's Unemployment Insurance Appeal Board hearing on August 24, 2020) on December 23, 2019, upon learning that Defendants had received Dr. Goodwillie's updated Return to Work form and that Ms. Monahan had submitted a letter of resignation, Ms. Juman sent an email to Mr. Kiley, the header of which referenced a possible accommodation of Ms. Monahan. Plaintiff does not know what Ms. Juman wrote in the email and what, if anything, Mr. Kiley responded.

66. Ms. Monahan was not scheduled to work from December 24, 2019, through December 26, 2019.

67. On or about December 26, 2019, Ms. Monahan received a letter via certified mail from HR. The letter stated that Defendants had received the Return to Work form that her doctor had submitted on or about December 19, 2019, and that Defendants might be willing to reconsider her need for an accommodation.  The letter did not instruct Ms. Monahan to take any steps to pursue this possibility nor did it state what if anything HR might do in this regard.

68. On December 27, 2019, Ms. Monahan resumed working her regular shift and continued to do so through January 6, 2019.  During this time none of her supervisors contacted her to discuss her requests for her accommodation or her decision to resign, and she heard nothing further from HR.

69. On January 4, 2020, two days before the effective date of her resignation, the office secretary gave Ms. Monahan a Resignation Notification form to complete. Ms. Monahan handed in the form the following day, attaching a six-page letter explaining the reasons for her resignation, which highlighted the issue of failure to accommodate her request for accommodation of the iPad. No one from Northwell responded to her submission.

70. Ms. Monahan's last day of work was January 6, 2020.

71. On or about January 27, 2020, she received an online exit survey from Northwell, which she completed and submitted the same day. In the exit survey, Ms. Monahan reiterated her reasons for leaving Northwell, detailing her harassment and her employers' refusal to provide her with reasonable accommodation.

72. On or about February 26, 2020, Ms. Monahan received a phone call from an individual who identified himself as "Ray" from Northwell Labor and Employee Relations and said he was calling regarding her responses to the exit survey the previous month. Ray said that Labor and Employee Relations would investigate the matter, but that she would not be informed of the results of the investigation because she was no longer an employee, and she never was informed of the results of any investigation.

73. After February 26, 2020, Ms. Monahan had no further contact with Northwell regarding her resignation or her complaints of harassment and denial of reasonable accommodation.

74. Ms. Monahan applied for Unemployment Insurance, which resulted in a hearing before the Unemployment Insurance Appeal Board on August 24, 2020, at which both Ms. Monahan and Mr. Kiley testified. On September 18, 2020 the Appeal Board issued its decision in favor of Ms. Mascari, finding that she had left her employment for good cause.

F. Defendants' Conduct Created Intolerable Working Conditions Amounting to Constructive Discharge for Which Plaintiff Has Suffered Loss of Earnings and Emotional Distress

75. If Northwell had engaged Ms. Monahan in an interactive process, as required by its own procedures, she would have learned that she could have presented documentation from her physical therapist as well as her surgeon, and she could have discussed possible accommodations such as a pushcart that would have allowed her to use an iPad while still rehabilitating her shoulder. However, no such interaction occurred.

76. Because Ms. Monahan's supervisors and the HR representative impressed on her that she had to get a new Return to Work form from her surgeon, and she had done all she could to get him to submit a form, Ms. Monahan was left to conclude that there was no way that Northwell would accommodate her disability and that her working conditions were intolerable, amounting to constructive discharge.

77. After leaving Northwell's employment, Ms. Monahan suffered lost earnings for the period from January 6, 2020, to October 18, 2021, when she was able to secure new employment. She suffered additional monetary loss under the terms of her new employment, where her rate of pay is less than it was at Northwell.

78. During the period from October 14, 2019 through January 6, 2020, while still employed by Northwell, Ms. Monahan suffered emotional distress as a result of Defendants' harassment because of her request for accommodation.  Since leaving Northwell, she has continued to suffer emotional distress from her experience, for which she has seen a therapist.

79. The actions of the Defendants described above were undertaken willfully, intentionally, maliciously, and with reckless indifference to Plaintiff's protected rights.

<u>**FIRST CAUSE OF ACTION**</u>
<u>**Harassment on the Basis of Disability under the ADA**</u>
**42 U.S.C. § 12112(a)**

80. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

81. Ms. Monahan was disabled within the meaning of the ADA following shoulder surgery on May 17, 2019, which significantly restricted her from lifting and holding objects with her left arm. Defendants' repeated threats of discipline, including termination of her employment, without giving her the opportunity to engage in an interactive process constituted harassment that was so

severe or pervasive as to materially alter the terms and conditions of her employment and thereby created a hostile work environment.

82. As a result of Defendants' harassment, Ms. Monahan has suffered emotional distress.

## SECOND CAUSE OF ACTION
### Harassment on the Basis of Disability under the NYSHRL
### N.Y. Exec. § 296(1)(a)

83. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

84. Ms. Monahan was disabled within the meaning of the NYSHRL following shoulder surgery on May 17, 2019, which significantly restricted her from lifting and holding objects with her left arm.  Defendants' repeated threats of discipline, including termination of her employment, without giving her the opportunity to engage in an interactive process, constituted harassment that far exceeded what a reasonable person would consider petty slights or trivial inconveniences and thereby created a hostile work environment.

85. As a result of Defendants' harassment, Ms. Monahan has suffered emotional distress.

## THIRD CAUSE OF ACTION
### Disability Discrimination under ADA, Constructive Discharge for Failure to Perform a Non-essential Function of the Job
### 42 U.S.C. § 12112(a)

86. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

87. Ms. Monahan was disabled within the meaning of the ADA following shoulder surgery on May 17, 2019, which significantly restricted her from lifting and holding objects with her left arm. Due to her disability, Ms. Monahan was unable to carry an iPad to take patient meal orders.

Carrying an iPad was not an essential function of her job since the iPad was used on only one of the nine floors of the hospital and only during one out of fifteen dietetic technician shifts.

88. Defendants' repeated threats of discipline, including termination, because she asserted that she was unable, for medical reasons, to carry an iPad constituted constructive discharge as they created an environment so intolerable that a reasonable person would have felt compelled to resign.

89. As a result of Defendants' harassment, Ms. Monahan has suffered emotional distress and lost wages.

**FOURTH CAUSE OF ACTION**
**Disability Discrimination under NYSHRL, Constructive**
**Discharge for Failure to Perform a Non-essential Function of**
**the Job**
**N.Y. Exec. § 296(1)(a)**

90. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

91. Ms. Monahan was disabled within the meaning of the NYSHRL following shoulder surgery on May 17, 2019, which significantly restricted her from lifting and holding objects with her left arm. Due to her disability, Ms. Monahan was unable to carry an iPad that was used to take patient meal orders. Carrying an iPad was not an essential function of her job as the iPad was used to take patient meal orders on only one of the nine floors of the hospital and only during one, out of fifteen, dietetic technician shifts.

92. Defendants' repeated threats of discipline, including termination, because she asserted that she was unable, for medical reasons, to carry an iPad constituted constructive discharge as they created an environment so intolerable that a reasonable person would have felt compelled to resign.

93. As a result of Defendants' harassment, Ms. Monahan has suffered emotional distress and lost wages.

### FIFTH CAUSE OF ACTION
### Failure to provide reasonable accommodation under ADA
### 42 U.S.C. § 12112(b)(5)(A)

94. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

95. Ms. Monahan was disabled within the meaning of the ADA following shoulder surgery on May 17, 2019, which significantly restricted her from lifting and holding objects with her left arm. Defendants were aware of Ms. Monahan's need for accommodation as early as October 14, 2019, when she first reported her need for accommodation to her supervisor, Ms. Adegbenro. However, Defendants failed to follow their own policies for reasonable accommodation, which required Ms. Adegbenro and, later, Mr. Kiley to direct Ms. Monahan to Site HR. When HR finally did become involved in Ms. Monahan's case nearly two months later, HR failed to engage Ms. Monahan in a cooperative dialogue/interactive process to determine whether carrying an iPad was an essential function of the job and, if so, whether Ms. Monahan's disability could be reasonably accommodated, for example, by using a pushcart to work an iPad shift. Defendants thus failed to provide Ms. Monahan with a reasonable accommodation that would have allowed her to continue performing the essential functions of her job as required by 42 U.S.C. § 12112(b)(5)(A).

96. As a result of Defendants' harassment, Ms. Monahan has suffered emotional distress and lost wages.

### SIXTH CAUSE OF ACTION
### Failure to provide reasonable accommodation under NYSHRL
### N.Y. Exec. Law § 296(3)(a)

97. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

98. Ms. Monahan was disabled within the meaning of the NYSHRL following shoulder surgery on May 17, 2019, which significantly restricted her from lifting anything with her right arm. Defendants were aware of Ms. Monahan's need for accommodation as early as October 14, 2019, when she first reported her need for accommodation to her supervisor, Ms. Adegbenro. However, Defendants failed to follow their own policies for reasonable accommodation, which required Ms. Adegbenro and, later, Mr. Kiley to direct Ms. Monahan to Site HR. When HR finally did become involved in Ms. Monahan's case nearly two months later, HR failed to engage Ms. Monahan in a cooperative dialogue/interactive process to determine whether carrying an iPad was an essential function of the job and, if so, whether Ms. Monahan's disability could be reasonably accommodated, for example, by using a pushcart to work an iPad shift. Defendants thus failed to provide Ms. Monahan with a reasonable accommodation that would have allowed her to continue performing the essential functions of her job as required by N.Y. Exec. Law § 296(3)(a).

99. As a result of Defendants' harassment, Ms. Monahan has suffered emotional distress and lost wages.

**SEVENTH CAUSE OF ACTION**
**Retaliation for Protected Conduct Under the ADA**
**42 U.S.C. §12203(a)**

100. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

101. Ms. Monahan's requests for accommodation with respect to the task of carrying the iPad was protected conduct under the ADA.

102. Defendants' repeated insistence that she carry the iPad and threats of disciplinary action, including termination, if she failed to follow the specific procedures for a return from medical leave, rather than allowing her to engage in an interactive process with respect to possible accommodation, was unlawful retaliation under the ADA.

103. As a result of Defendants' retaliatory harassment, Ms. Monahan has suffered emotional distress and lost wages.

## EIGHTH CAUSE OF ACTION
### Retaliation for Protected Conduct Under the NYSHRL
### N.Y. Exec. § 296(7)

104. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

105. Ms. Monahan's requests for accommodation with respect to the task of carrying the iPad was protected conduct under the NYSHRL.

105. Defendants' repeated insistence that she carry the iPad and threats of disciplinary action, including termination, if she failed to follow the specific procedures for a return from medical leave, rather than allowing her to engage in an interactive process with respect to possible accommodation, was unlawful retaliation under the NYSHRL.

106. As a result of Defendants' retaliatory harassment, Ms. Monahan has suffered emotional distress and lost wages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in her favor against Defendants and respectfully requests that this Court award her:

a) Compensation for lost earnings between January 6, 2020, and October 18, 2021, when she was unemployed;

b) Compensation for lost earnings from October 18, 2021, through the present based on the salary difference between Plaintiff's dietetic technician job at NSUH and plaintiff's current salary;

c) Compensatory damages for emotional distress;

d) Reasonable attorneys' fees and the costs of this action;

e) Prejudgment and post-judgment interest;

f) Punitive damages in an amount to be determined at trial;

g) Any further relief as the Court may deem necessary and proper.


Dated:          July 14, 2022
                New York, New York


                                Respectfully submitted,

                                Bantle & Levy LLP
                                 By: */s/ Sherie N. Buell*
                                        Sherie N. Buell
                                        Lee F. Bantle
                                        Bantle & Levy LLP
                                        99 Park Avenue, Suite 1510
                                        New York, New York 10016
                                        (212) 228-9666
                                        buell@civilrightsfirm.com
                                        bantle@civilrightsfirm.com
                                        Attorney for Plaintiff

                                Washington Square Legal Services, Inc.,
                                 By: */s/ Laura Sager*
                                        Laura Sager
                                        Washington Square Legal Services, Inc.
                                        245 Sullivan Street, Fifth Floor
                                        New York, New York 10012
                                        (212) 998-6442
                                        laura.sager@nyu.edu
                                        Attorney for Plaintiff